**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-20367-ALTMAN**

**DANA LOPEZ**, *et al.*,

*Plaintiffs*,

*v.*

**JW LEE INC.**, *d/b/a* **SCARLETT'S CABARET**,

*Defendant*.

_______________________________________/

**ORDER**

Entertainers sued an adult-entertainment club, alleging violations of the Fair Labor Standards Act ("FLSA"). The entertainers now move for partial summary judgment. After careful review, we **GRANT in part** and **DENY in part** the motion for partial summary judgment.

**THE FACTS**

Scarlett's Cabaret is "a gentlemen's club owned and operated by the Defendant." Motion for Partial Summary Judgment (the "MSJ") [ECF No. 74] at 1. Our Plaintiffs "worked for the Defendant[ ] as entertainers or dancers in Scarlett's Cabaret," where they claim "they were misclassified as independent contractors, were not paid any minimum hourly wage, and were forced to surrender their tips to the Defendant[ ]." *Id.* at 1–2.

The Plaintiffs sued the Defendant in January 2025, bringing claims under the FLSA, the Florida Constitution, and the Florida Minimum Wage Act. *See* Complaint [ECF No. 1] ¶¶ 81–121. They filed the First Amended Complaint [ECF No. 12] in February 2025. And, in May 2025, the Plaintiffs filed the operative Second Amended Complaint (the "SAC") [ECF No. 35], removing the Florida Minimum Wage Act claim and alleging three counts: *one*, a minimum-wage violation under

Florida law; *two*, a minimum-wage violation under the FLSA, 29 U.S.C. §§ 206, 215; and *three*, an "illegal-kickback" violation under 29 C.F.R. § 531.35. *See* SAC ¶¶ 81–113.

In November 2025, the Plaintiffs filed their MSJ, arguing that the Defendant has failed to establish two of its affirmative defenses. In December 2025, the Defendant filed a Response in Opposition to the MSJ (the "Response") [ECF No. 82]. And, in January 2026, the Plaintiffs filed a Reply in Support of the MSJ (the "Reply") [ECF No. 91].[1] The MSJ is now ripe for adjudication.

## THE LAW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.* "All reasonable inferences must be drawn in favor of the nonmoving party, but a mere scintilla of evidence will not suffice to overcome a motion for summary judgment." *Ismael v. Roundtree*, 161 F.4th 752, 758–59 (11th Cir. 2025) (cleaned up); *see also Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) ("When a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but by affidavits, depositions, answers to interrogatories, and admissions must show that there are specific facts demonstrating that there is a genuine issue for trial."). "The moving party has the burden of demonstrating that there are no genuine issues of material fact," but "[o]nce a summary judgment movant's initial burden is met, the burden shifts to the nonmoving party to bring the court's attention

[1] In March 2026, we denied the Plaintiffs' Motion for Conditional Certification [ECF No. 33], finding that the Plaintiffs executed collective and class-action waivers. *See generally* Order Denying Certification [ECF No. 92].

to evidence demonstrating a genuine issue for trial." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325–26, 1335 (11th Cir. 2024) (cleaned up).

## ANALYSIS

The Plaintiffs move for partial summary judgment as to two of the Defendant's affirmative defenses. *First*, they assert that the "Defendant is precluded from prevailing on any argument that it acted in good faith and had reasonable grounds for believing its omission to pay [the] Plaintiffs minimum wage or requiring [them] to surrender their tips were not violations of the FLSA[.]" MSJ at 9. *Second*, the Plaintiffs contend that the "Defendant cannot say that it somehow is entitled to a set-off for sums of money that are negotiated between the entertainers and the customers." *Id.* at 8. We address each theory in turn.

### a. The Good-Faith Defense

"Under the FLSA, liquidated damages are presumptively available." *Gelber v. Akal Sec., Inc.*, 14 F.4th 1279, 1288 (11th Cir. 2021). Section 206 mandates that covered employers pay employees minimum wages. *See* 29 U.S.C. § 206. And Section 216 provides that employers who violate Section 206 "shall be liable to the . . . employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). But, under Section 260, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], . . . the court may, in its sound discretion, award no liquidated damages[.]" 29 U.S.C. § 260. "The employer has the burden of establishing both the subjective and objective components of that good faith defense against liquidated damages." *Gelber*, 14 F.4th at 1288 (quotation marks omitted). And that "burden is a difficult one, with double damages being the norm and single damages the exception." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).

In its First Amended Answer ("FAA") [ECF No. 63], the Defendant states that the Plaintiffs' claims "are barred, in whole or in part, because Defendant has a reasonable, good faith belief that it was not violating the FLSA[.]" FAA at 8. But our Plaintiffs seek partial summary judgment as to the availability of that defense, arguing that the Defendant "failed to consult the advice of counsel, the advice of the Department of [L]abor, or any labor consultant"—and so "cannot establish an objective or subjective basis for the[ ] affirmative defense nor a reasonable, good faith belief that [its] classification of the Plaintiffs was proper." MSJ at 6.

The Defendant deems that theory "premature," noting that the Plaintiffs haven't yet "established the predicate requirement"—*i.e.*, "an actual violation of the FLSA." Response at 4. And "[e]ven if the Court were to assume . . . that [the] Plaintiff[s] could establish an FLSA violation," the Defendant continues, the "attempt to obtain summary judgment on good faith . . . improperly bypasses a fact-intensive inquiry reserved for the jury," since the Plaintiffs must also establish "whether such violation was willful for purposes of determining whether the three year statute of limitations applies." *Id.* at 15.[2]

In any event, the Defendant contends that the "record contains evidence from which a reasonable jury could conclude that Defendant acted with an honest intention to comply with the law and on objectively reasonable grounds." *Id.* at 16. To that end, it notes that its "licensing agreements . . . expressly identified . . . an independent[-]contractor [status]" and "explained the significance of that classification." *Id.* at 16–17. And the Defendant further represents that it "utilized SWR Consulting" ("SWR"), an "independent third-party company responsible for payroll-related matters and providing employment-law compliance materials to the Club." *Id.* at 17. Specifically, it

[2] The FLSA provides that "any cause of action for unpaid minimum wages . . . or liquidated damages, . . . may be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a *willful* violation may be commenced within *three years* after the cause of action accrued[.]" 29 U.S.C. § 255(a) (emphases added).

explains that it "relied on SWR's professional expertise and understanding of applicable laws in connection with its payroll practices," "underst[ood] that SWR would advise [it] if any payroll practice[s] were unlawful," and "believed [that] SWR's legal team had made changes to the entertainer licensing agreements." *Ibid.* And this evidence, the Defendant concludes, "at a minimum, creates disputed factual questions regarding the extent of Defendant's reliance on third-party guidance and the reasonableness of its beliefs." *Ibid.*

We agree with the Defendant that the record precludes summary judgment here because—even putting aside the Defendant's proper-order, independent-contractor, and willfulness arguments—there remain genuine issues of material fact in this case.

The Defendant focuses on the deposition of Shawn Barnes, the Defendant's "General Manager." Barnes Deposition [ECF No. 75-2] at 10. In that testimony, Barnes explained that the Defendant relies on SWR "if we need industry answers," that SWR has "attorneys," that SWR provided employment-law posters to hang inside the club, and that he "believe[d]" that SWR "would let us know if there's anything illegal" about the pay policies. *Id.* at 9, 26; *see also id.* at 34–35 ("Q. Does the Company hang posters regarding employment laws in the club? A. Yes . . . . Q. Where did you get the posters? A. SWR Consulting."). And while Barnes stated that *he* hadn't "personally asked" SWR about the legality of those policies or undertaken legal research on the subject, he never testified that the Defendant hadn't taken these steps. *Id.* at 26; *see also id.* at 26–27 ("Q. Have you ever looked up any case law regarding dancers or entertainers and pay policies? A. I have not. Q. Do you know if the Company has looked up case law related to dancers or entertainers? A. I don't know that personally, no.").

That testimony neither establishes nor rules out a good-faith defense. "Good faith requires some duty to investigate potential liability under [the] FLSA." *Friedman v. S. Fla. Psychiatric Assocs., Inc.*, 139 F. App'x 183, 186 (11th Cir. 2005) (cleaned up); *see also Martin v. Indiana Michigan Power Co.*, 381

F.3d 574, 584 (6th Cir. 2004) ("The employer has an affirmative duty to ascertain and meet the FLSA's requirements[.]"). So, "[a]n employer invoking good faith must show not only that it tried, but that it took active steps to ascertain the dictates of the FLSA and made a genuine effort to comply with them." *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 411 (4th Cir. 2025) (quotation marks omitted); *see also Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 151 (2d Cir. 2008) (explaining that, even when an employer takes an "active step," the "purpose" of that action must be "to ascertain the dictates of the FLSA with respect to the issue at hand" (cleaned up)).

Consider some examples. On one end of the spectrum, acting "on the advice of counsel" can constitute good faith if the "lawyer's advice [is not] objectively unreasonable." *Gelber*, 14 F.4th at 1288; *see also Chavez-Deremer*, 147 F.4th at 411 ("One practical—and judicially recognized—way to satisfy the good faith showing is for the employer to prove that it sought out and adhered to legal advice regarding compliance with the FLSA."); *Sec'y, United States Dep't of Lab. v. E. Penn Mfg. Co., Inc.*, 123 F.4th 643, 651 (3d Cir. 2024) ("East Penn asked legal counsel how to follow the law . . . . Even though that advice turned out to be mistaken, following it was reasonable."). On the other end of the spectrum, a defendant *cannot* lay claim to good faith if it disregards judicial or Department of Labor ("DOL") guidance that "call[s] into question the legality of [a] practice," *Meeks v. Pasco Cnty. Sheriff*, 688 F. App'x 714, 717–18 (11th Cir. 2017), or relies on outdated information, *see Friedman*, 139 F. App'x at 186 ("Reading information 20 years ago regarding the FLSA does not provide an objectively reasonable basis for believing one's conduct comports with the FLSA.").[3]

[3] That list isn't exhaustive: Circuits across the country have identified similarly doomed practices. *See, e.g.*, *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007) ("intentional manipulation of the records"); *Ramirez v. Lin*, 830 F. App'x 672, 675 (2d Cir. 2020) (having "extensive knowledge of the FLSA's requirements" but "utterly fail[ing] to take the steps necessary to ensure . . . pay practices compl[y] with the Act" (quotation marks omitted)); *Solis v. Min Fang Yang*, 345 F. App'x 35, 39 (6th Cir. 2009) ("ignorance of the law, adherence to . . . cultural practices, and language difficulties"); *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 943 (8th Cir. 2008) ("delegating the payroll function to a subordinate").

At this stage of the case, we cannot say where the Defendant falls on the good-faith spectrum. Barnes's deposition—the *only* evidence before us—provides limited information. It tells us that Barnes himself dealt directly with a non-lawyer—one Ed Anakar—at SWR, but doesn't rule out the possibility that Anakar relayed legal advice from SWR's attorneys, that someone else communicated with SWR (or its lawyers) on behalf of the Defendant, or that the Defendant receives legal counsel generally. And while the testimony confirms that Barnes himself didn't conduct legal research or seek legal advice, it provides no reason to believe that someone in his role would have such responsibilities. *See* Barnes Deposition at 12–13 ("Q. With your position as general manager, what are your job duties with JW Lee, Inc.? A. Running a careful, clean environment for our staff, guests, and entertainers. Q. What does that entail? A. Being present here. Making sure that our staff is present. Making sure that we have inventory. Making sure the kitchen is operational. Making sure that the cleaning crew has done their job. Some cash handling. Like I said, basically making sure we have a safe, clean environment. Q. Are you involved with the accounting for JW Lee, Inc.? A. No.").

So, construing all reasonable inferences in favor of the Defendant, we find that Barnes's testimony raises the possibility that the Defendant took affirmative steps to seek and follow expert—even *legal*—advice. At least today, then, we find that the record contains an unresolved material fact: *viz.*, the nature of the Defendant's reliance on an "outside expert." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1273 (11th Cir. 2008). Our Plaintiffs insist (it's true) that the "Defendant did not consult with . . . any attorney to determine if its policies were legal." Reply at 3. But the evidence before us suggests that SWR has "attorneys" on staff, Barnes Deposition at 9 ("A. There are attorneys."); that the Defendant relied *in some part* on SWR for legal advice, *see id.* at 26 ("A. I believe SWR Consulting would let us know if there's anything illegal."); and that SWR provided at least *some* legal-adjacent services, *see id.* at 35 ("Q. Where did you get the posters? A. SWR Consulting."); *cf. Portillo v. Kincaid Inc.*, 826 F. App'x 384, 386 (5th Cir. 2020) (listing evidence that supported a good-

faith determination, including that "there were posters . . . advising employees of their overtime and minimum wage rights" and that "[a]t least some of these posters were purchased from individuals who visit restaurants and sell posters to them for the very purpose of helping restaurants maintain FLSA compliance").

Our Defendant might well have acted without good faith. But that's a question for a later date. Today, we don't know whether the Defendant relied *exclusively* on SWR. We don't know whether SWR holds itself out as an expert on FLSA matters. We don't know whether (or how) SWR's attorneys guided the Defendant. And we don't know whether anyone besides Barnes interacted with SWR. We therefore cannot enter summary judgment as to the good-faith defense. *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgement.").[4]

**b. The Set-Off Defense**

As we discussed above, the FLSA sets minimum-wage rates for covered employers. *See* § 206. But the relevant DOL regulations provide that "[s]ervice charges and other similar sums" can—under certain conditions—"be used in their entirety to satisfy the monetary requirements of the Act." 29 C.F.R. § 531.55(b). And those regulations distinguish such *charges* and *sums* from *tips*. *See* 29 C.F.R. § 531.55(a) ("A compulsory charge for service, such as 15 percent of the amount of the bill, imposed

---

[4] Given those open questions, we've no need to pass today on whether an employer takes the requisite "serious and informed steps to adhere to the applicable law" by consulting with a non-lawyer who isn't employed by the Department of Labor. *Chavez-Deremer*, 147 F.4th at 412. We'll note only that the Sixth and Tenth Circuits have suggested that accountants *might* fulfill that function. *See, e.g.*, *Sec'y of Lab. v. Timberline S., LLC*, 925 F.3d 838, 857 (6th Cir. 2019) ("Although caselaw usually cites discussions with attorneys or government officials as evidence of good faith, some cases have extended this rationale to accountants." (citations omitted)); *Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984) (finding testimony that the employer's "accountant told him eight or ten years before trial that his method . . . was legal" as "not enough to meet [the] burden of showing that he had reasonable grounds for believing that his actions complied with the Act").

on a customer by an employer's establishment, is not a tip[.]"). Under the regulations, a "tip" is a "sum presented by a customer as a gift or gratuity in recognition of some service performed for the customer." 29 C.F.R. § 531.52(a). "Whether a tip is to be given, and its amount, are matters determined solely by the costumer." *Ibid.* So, a tip "is to be distinguished from payment of a charge . . . made for the service." *Ibid.*

Applying those regulations to the restaurant context, the Eleventh Circuit has found that a "mandatory 18% service charge was a bona fide service charge and not a tip because it was a compulsory charge for service, and the decision to pay it—and the amount to pay—were not determined solely by the customer." *Compere v. Nusret Miami, LLC*, 28 F.4th 1180, 1189 (11th Cir. 2022) (cleaned up); *see also id.* at 1188 ("The customers had no ability to determine on their own whether they would pay the service charge."). And it has reached that same finding for an "automatic, non-discretionary service charge of 20%" on customers' bills. *Nelson v. MLB Hotel Manager, LLC*, 2022 WL 2733720, at *2 (11th Cir. July 13, 2022) (quotation marks omitted); *see also ibid.* ("Nelson fails to identify any record evidence suggesting that a customer could unilaterally decide not to pay the charge . . . . Thus, they could be credited toward the defendants' minimum wage and overtime obligations.").

In its FAA, the Defendant states that, "[i]f the Plaintiff is successful in obtaining the payment of minimum wages under the FLSA," then the Defendant is "entitled to a set-off against such payments for all amounts received by the Plaintiff from performance fees and service charges at Defendant['s] business." FAA at 8. Our Plaintiffs also seek partial summary judgment as to the availability of that defense, arguing that the "performances and the sums paid by the customer are . . . specifically negotiated between the entertainer and the customer." MSJ at 8. According to the Plaintiffs' view of the evidence, "the Defendant does not set any prices for the services that the entertainers provide"; the "entertainers are free to negotiate all the prices of their services with the

customer," "make tips while they perform on stage," and "can charge whatever they want for the performances"; and the Defendant "does not have performance fees," "suggest[s] minimums for dances," and "does not have a record keeping system for how much entertainers earn nor how many performances an entertainer might perform each shift." *Id.* at 7.

Resisting that conclusion, the Defendant maintains that the "payments functioned as service charges" and that "the only disputed issue is whether those charges were set by the [Defendant] or by [the] Plaintiff." Response at 18. Specifically, the Defendant claims that testimony provided by Dana Lopez—the Named Plaintiff—"establishes that the baseline payments were mandatory charges tied to specific services, not discretionary gratuities determined solely by the customer," thereby making "summary judgment on [the] entitlement to a set-off . . . improper." *Id.* at 19.

We agree with the Defendant that "the record contains competing testimony regarding whether standard charges existed[.]" *Ibid.* To be sure, as the Plaintiffs notes, Barnes testified that the *entertainers*—not the Defendant—set prices. *See* Barnes Deposition at 69 ("Q. Does the Club set the prices for any of the services that the dancers do? A. No. Q. The dancers are free to negotiate all prices with customers? A. Yes. Q. How do the dancers get paid? A. Clients. Q. The clients are tipping the dancers? A. They do tip the dancers. Yes, they do." (objections omitted)). But Lopez's testimony, as the Defendant insists, complicates that narrative. According to Lopez, *the Defendant* set the prices for the various services offered by the entertainers:

> Q. Assume I am your customer . . . . I would like a table dance, how much is that? What would your response be?
>
> A. $20
>
> . . . .
>
> Q. That was the pre-negotiated contractual amount between me and you, that I was going to pay you 20 bucks for dancing for me for five minutes; right?
>
> A. Yes.

> Q. It's not a tip. That's the pre-negotiated fee for the dance, 20 bucks; right?
>
> A. And we had to obey that price. So it's not the price that I wanted. It was the price set by the club, and I had to follow that rule for the price that the club would give me.

Lopez Deposition [ECF No. 82-5] at 46–47.

Lopez proceeded to detail a range of other services—and prices—set by *the Defendant*. *See id.* at 43–44 ("Q. How much did you charge customers to dance for them? A. It was different fees . . . . There were . . . fees for what we called the champagne room, where the club would charge a minimum of 30 minutes or one hour. And the club would charge the customer for 30 minutes $600, and for one hour, the club would charge one hour in the champagne room for $1,150 that the club would charge for the champagne room."). But she also noted that entertainers kept payments *above* the pre-set price. *See id.* at 48 ("Q. And if in my hypothetical you have danced for me for five minutes, and I really liked the dance, and instead of paying you $20, I paid you $30, the extra $10 is a tip; correct? A. Yes.").

Drawing all reasonable inferences in favor of the Defendant, we find a genuine issue of material fact in this conflict between Lopez's and Barnes's testimonies. Whereas Barnes stated that the entertainers set "all" prices for services, Barnes Deposition at 69, Lopez testified that the Defendant—not the entertainers—determined the prices. And that discrepancy matters, at least at this summary-judgment stage, because it leaves unclear whether, under the DOL regulations, the pre-set sums received by the entertainers should count as *service charges* or *tips*.

Our Plaintiffs counter that, "[e]ven if [the] Defendant established a genuine issue of material fact as to whether the sums the customers provide to the entertainers are set by the Club or negotiated with the entertainer, this is only one factor looked at by the courts." Reply at 5. And because "[t]he burden remains on the Defendant to establish [its] affirmative defense," the Plaintiffs continue, we should find that the Defendant "failed to come forward with evidence that raises a genuine issue of material fact." *Ibid.* But this argument ignores the fact that "the critical feature of a tip is that whether

a tip is to be given, and its amount, are matters *determined solely by the customer*." *Compere*, 28 F.4th at 1186 (cleaned up). And so, since Lopez testified that she "had to follow . . . the price that the club would give me," Lopez Deposition at 47, we cannot erase a material factual dispute on the basis of factors the Plaintiffs never identify and the caselaw never contemplates. *See Compere*, 28 F.4th at 1186 ("Critically, whether and how much to pay are not determined solely by the customer. Indeed, those decisions are not determined by the customer at all." (quotation marks omitted)).

In sum, we cannot grant summary judgment on the *whole* offset defense. But we can grant summary judgment on *one* aspect of that defense. As the evidence stands today, it's possible that the Defendant sets the price for services, that payments covering those services count as service charges, and that those payments offset FLSA violations. And yet everyone agrees that entertainers can keep—as tips—whatever amount exceeds those standard prices. We can therefore find that excess payments *are* tips.

To put the matter concretely: If an entertainer—be it on her own volition or by dint of the Defendant's mandate—charges $20 for a dance and yet receives $30 from a patron, then *at least* $10 of the $30 should be viewed as a tip (and therefore beyond the reach of an offset defense). So, although we'll deny summary judgment as to how we should understand the initial $20, we'll award summary judgment on a narrow fact: Any sum that is given on a patron's own initiative and that exceeds the standard price for services cannot be used to offset minimum-wage deficits.

## CONCLUSION

Accordingly, we **ORDER and ADJUDGE** as follows:

1. The Plaintiffs' Motion for Partial Summary Judgment [ECF No. 74] is **GRANTED in part** and **DENIED in part**.
2. The parties shall file an updated joint scheduling report, as required by S.D. FLA. L.R. 16.1(b)(2), within **14 days** of this Order.

**DONE AND ORDERED** in the Southern District of Florida on August 21, 2026.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record